ROBERT R. POWELL, ESQ.   CSB# 159747
LAW OFFICES OF ROBERT R. POWELL
925 West Hedding Street
San Jose, California 95126
T: 408-1053-0200 F: 408-1053-0203          E-FILED 09/21/2012
E: rpowell@rrpassociates.com

NICOLE WILLIAMS, ESQ.   CSB# 203006
4790 Irvine Blvd., Ste. 105, #263
Irvine, California 92620
T: (949) 230-9775
E: labarriste@aol.com

Attorneys for Plaintiffs


IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA


| | | |
|---|---|---|
| SEBASTIAN XOSS, MIRSHA LOPEZ, | ) ) ) | Case No. CV 12-01400 PSG (RZx) |
| Plaintiffs, | ) ) ) | SECOND AMENDED COMPLAINT FOR VIOLATION OF OF CIVIL RIGHTS [42 U.S.C. 1983] |
| v. | ) ) | |
| COUNTY OF LOS ANGELES, MARIANELA INCHAUSTI, DELMY MENDOZA, ARUNA PATEL, ANA HOLGUIN, CHRISTOPHER SOSA, ALESIA CAMPBELL, MICHAEL NEWMAN, DOES 1-10 inclusive, | ) ) ) ) ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants. | ) ) ) | |

# I.

## JURISDICTION AND INTRADISTRICT ASSIGNMENT

1.     **JURISDICTION**.  Plaintiffs bring this lawsuit pursuant to 42 U.S.C. Section 1983 to redress the deprivation by defendants, at all times acting under color of state law, of rights secured to Plaintiffs under the United States Constitution, including the First, Fourth, Fifth, and Fourteenth Amendments.

2.     Jurisdiction is conferred on this Court by 28 U.S.C. section 1343 (3) and 1343 (4), which provides for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. 1983.  Jurisdiction is also conferred by 28 U.S.C. 1331 (a) because claims for relief derive from the United States Constitution and the laws of the United States.

3.     This Court has supplemental jurisdiction over Plaintiffs' state law causes of action pursuant to 28 U.S.C. § 1367(a).

4.     Venue properly lies in the Central District of California, in that the events and circumstances herein alleged occurred in the County of Los Angeles, and at least one defendant resides in the County of Los Angeles.

5.     Plaintiffs have exhausted their remedies, or otherwise complied with state law requirements for the filing of appropriate notices of tort causes of action against defendants pursuant to state law, inclusive of the filing of a Tort Claim Notice pursuant to California G.C. 905. All of Plaintiffs' claims have

been rejected and they have timely filed lawsuits pursuant to such rejections, as required by California law.

## II

## PARTIES

6.      Plaintiff Sebastian Xoss (aka Sebastian Casalta, hereafter "Sebastian") and Plaintiff Mirsha Lopez, (hereafter "Mirsha") at all times relevant herein, were residents of the County of Los Angeles, and the lawful biological parent of a daughter Am.L (age 6 at the inception of the events of February 10th, 2011 described herein), and a son Ae.L (age 8 at the inception of the events of February 10th, 2011 described herein).

7.      The children's full names are known to all defendants, and are being withheld herein, unless otherwise ordered by the court, to provide them some level of confidentiality.  The adult plaintiffs may also be referred to collectively herein as "parents" and/or "parent Plaintiffs."

8.      Prior to the removal of the children from the parents on February 10th, 2011 detailed herein, the parents raised, nurtured, provided guidance, education, and care, for the minor children, in a loving, emotionally, academically and financially supportive, intact nuclear family.

9.      Minor Plaintiffs Am.L. and Ae.L., Plaintiffs herein, are represented by Mirsha Lopez as Guardian Ad Litem, and/or Mirsha has applied to this court for

appointment as the childrens' Guardian Ad Litem.  That requested was granted by an Order of this court on 6/18/12 (Docket #21).

10.     The Plaintiff children will collectively be referred to herein on occasion as "the children," and/or "minor Plaintiffs."  They will also be included in the references to "Plaintiffs" as used herein, as indicated by the context and circumstances in which the term "Plaintiffs" is used.

11.     Defendant COUNTY OF LOS ANGELES ("COUNTY") is a municipality in corporate form, organized and existing under the laws of the State of California, and has as an administrative subunit thereof the HUMAN SERVICES SYSTEM (hereinafter "HSS"), and a subunit thereof, the DEPARTMENT OF CHILD AND FAMILY SERVICES (hereinafter "DCFS" and/or referred to as "Agency"), all of which will at times be collectively referred to herein as COUNTY.

12.     HSS and DCFS are COUNTY governmental agencies organized and existing pursuant to the law and policies of defendant COUNTY, which together with COUNTY, promulgated, encouraged, and/or permitted, the policies, patterns, and practices under which the individual defendants, and DOES 1 – 10, committed the acts or omissions complained of herein, and condoned, ratified, and encouraged the conduct of the COUNTY employee-defendants, as

complained of herein, or failed to train, or inadequately trained the COUNTY

employee-defendants.

13.     In addition, COUNTY had as a law enforcement subunit thereof, the

COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT (hereinafter

"SHERIFF").

14.     PLAINTIFFS hereby sue all agencies and departmental units of

COUNTY specified hereinabove under the designation of COUNTY herein, but

may designate and/or write in terms of "DCFS" and/or "SHERIFF'S" as

appropriate in the context of the situation or circumstances being described.

15.     As the employer of sheriffs, social workers and their supervisors,

COUNTY had primary responsibility for the training, education, and

supervision of sheriffs and social workers, including supervisors of such

employees, and PLAINTIFFS are informed and believe and thereon allege that it

was COUNTY which promulgated, encouraged, administered, and/or permitted,

the policies, practices, customs, and procedures under which the individual

defendant employees of COUNTY committed the acts or omissions complained

of herein.

16.     PLAINTIFFS allege COUNTY, either intentionally or recklessly,

whether as a result of policies, practices, customs, or procedures ("policies"), or

as a result of ineffective, non-existent, or inadequate training and education of

employees ("training"), caused the individually named employee-defendants to

engage in the actions or inactions complained of herein, and such policies and

training were a moving force responsible for the acts or omissions of said

individually named defendant employees leading to the violations of rights of

the PLAINTIFFS as complained of herein.  Though not specified separately in

the Claim for Relief  "headings" hereinbelow, PLAINTIFFS contend and allege

the COUNTY is liable for each of the actions complained of in each of the

Claims for Relief below, by virtue of the law set forth in *Monell v. Department*

*of Soc. Svcs.*, 436 U.S. 658 (1978), and it's progeny, though not liable for

punitive damages.  A separate Claim for Relief addressing the COUNTY's

alleged *Monell* liability is included.  Respondeat superior liability is alleged as

against the COUNTY for any and all state law based Claims for Relief.

17.     PLAINTIFFS are informed and believe, and thereon allege, that the

COUNTY has a policy, practice, custom, or procedure ("policy") which

contains the following features constituting a deliberate indifference to the rights

and safety of families such as PLAINTIFFS family, residing in the County of

Los Angeles;

- A policy authorizing and or ratifying without threat of discipline or reprimand,

the repeated removal of children from their parents or guardians without a

warrant, consent, or imminent risk of serious bodily injury to a child[ren] such that would justify or make lawful the removal of the child,

- A policy authorizing or ratifying without threat of discipline or reprimand, the inclusion of false statements, half-truths, and misrepresentations in reports given to the juvenile dependency court, as well as the intentional failure to include information which is exculpatory to the proposition that detention of the children is necessary for their protection,

- A policy authorizing or ratifying without threat of discipline or reprimand, the inclusion of allegations denoted in the Welfare & Institutions Code by alpha's "a" through "j," that are of a more severe substantive nature in terms of potential consequences to the continuation of the parent-child relationship, so that parents will be compelled to agree to lesser allegations with lesser consequences to the continuation of the parent-child relationship rather than contest the necessity of juvenile dependency court jurisdiction and the continued involvement of DCFS in the family's life.

18.     PLAINTIFFS are informed and believe, and thereon allege, that the COUNTY has no training, or inadequate training, on;

-  the scope, nature, and importance of the 14th Amendment based rights of familial association, including not only the right to raise and care for one's child without unreasonable government interference, but the right of parents to refuse

immunizations and/or other medical treatment, and to receive advance notice of any medical testing, evaluation, or provision of services for their children, and to attend any medical procedures for their children in the care of COUNTY.

- the nature, extent, and duration of psychological and emotional damage caused to children and parents by the unlawful and/or unreasonable intervention of government actors acting under the guise of protecting children, including but not limited to, 1.) the baseless, unreasonable, unlawful removal of children from their parents, 2.) the inclusion of false and misleading statements in juvenile police and/or juvenile court reports, as well as, 3.) failing to include exculpatory and/or mitigating information in juvenile dependency court reports, in an effort to portray the parents, child, and circumstances in a false light in order to influence a court to retain custody of children, 4.) the use of threats, intimidation, and coercion to force parents to waive their rights, including threats of the removal of children and including unfavorable and false statements, as well as misrepresentation of facts (i.e. "half-truths") in reports submitted to juvenile dependency court judges for the purpose of insuring and continuing the separation of family members to their detriment and in violation of their rights under both state and federal law.

- the legislative reasoning behind protective custody warrants, the existence of protective custody warrants, and the use of protective custody warrants pursuant

to California law specifically, and the use of warrants generally when considering the removal of children from their parents/caretakers that are not at imminent risk of serious bodily injury, and

- the existence and relevance of federal laws and precedent on the removal of children from their parents / guardians in the context of an investigation of a child abuse or neglect referral.

19.     Defendant DELMY MENDOZA ("MENDOZA"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFFS information and belief, an emergency response social worker, employed by COUNTY.

20.     Defendant MARIANELA INCHAUSTI ("INCHAUSTI") whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFFS information and belief, a social worker, employed by COUNTY, and a supervisor of other social workers, including MENDOZA.

21.     PLAINTIFFS are informed and believe that INCHAUSTI was the supervisor that MENDOZA conferred with during her "investigation" at the motel room the PLAINTIFFS were staying in on February 10th, 2011, and that INCHAUSTI participated in the decision to remove, or otherwise condoned, agreed with MENDOZA on the removal of the minor children that evening, and/or ratified the removal after it occurred, despite her failure to "investigate"

anything, and failed to promptly return the children in spite of the evidence provided by the parents in her office building shortly after the removal that evening, as described hereinbelow.

22.     Defendant ANA HOLGUIN ("HOLGUIN"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFFS information and belief, a social worker, employed by COUNTY, and the declarant under oath for the filing of the initial W&IC 300 Petition in the juvenile dependency matter involving the PLAINTIFFS herein which contained allegations which were false, and/or made with knowledge of their falsity or reckless disregard for their truth or falsity.

23.     Defendant ARUNA PATEL ("PATEL"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFFS' information and belief, an emergency response social worker, employed by COUNTY, and the declarant for the filing of the First Amended W&IC 300 Petition in the juvenile dependency matter involving the PLAINTIFFS herein which included allegations additional to the initial Petition, which were false, and/or made with knowledge of their falsity or reckless disregard for their truth or falsity.

24.     Defendant CHRISTOPHER SOSA ("SOSA"), whose acts as alleged herein were performed under color of state law, was at all times material hereto,

upon PLAINTIFFS' information and belief, a social worker and/or supervisor, employed by COUNTY, and SOSA personally ratified, condoned, and supported the affirmative unlawful acts against the PLAINTIFFS, described herein.

25.    Defendant ROSARIO FERNANDEZ ("FERNANDEZ"), whose acts alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFFS' information and belief, a social worker and/or supervisor employed by COUNTY.

26.    Defendant HECTOR ALVAREZ ("ALVAREZ"), whose acts alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFFS' information and belief, a social worker and/or supervisor employed by COUNTY.

27.    Defendant MICHAEL NEWMAN ("NEWMAN"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFFS' information and belief, a deputy sheriff employed by COUNTY.

28.    PLAINTIFFS are informed and believe and, based upon such information and belief, allege that, at all times herein mentioned, each and every defendant-employee of the COUNTY was the agent and/or employee of their co-defendants, and was acting either in their individual capacity or in the scope,

purpose and authority of COUNTY, and/or in their employment or agency with said entities, and with the knowledge, permission, ratification, and/or consent of said co-defendants and/or entities.

29.     PLAINTIFFS are informed and believe, and thereon allege, that each of the named individual defendants herein, did knowingly and willingly, with a common intent and scheme set forth in further detail herein below, conspire to injure PLAINTIFFS, and deprive PLAINTIFFS of their rights, liberties, and interests, as such rights are afforded under the United States Constitution and the California State Constitution, and conspired generally to damage PLAINTIFFS and inflict great injury upon them.

III.

**FACTS**

30.     On February 10th, 2011, at approximately at 2:00 pm Sebastian was in the process of cleaning the hotel room where he and his family were staying, and was in the process of commencing to take medications for some physical maladies he suffers from that are related to a serious bicycle versus car accident he was involved in on a bicycle in 2001, and a fall in which he struck his head and lost consciousness in June of 2010.  He had told the children they would go out and get something to eat in a few minutes.

31.     The children, Am.L and Ae.L were sitting on the bed doing their homework.  Mirsha was at work, performing her job as an assistant and service worker to families that are raising autistic children.

32.     At that time there was a knock at the door by a Caucasian male about six foot tall, who appeared to be in his 50's.  Immediately after knocking on the door, the man, later identified as NEWMAN, proceeded to say not less than twice, "Warrant, sheriff."

33.     Sebastian pulled the curtain back, looked out the window, and saw NEWMAN, who was dressed in plainclothes, not a police uniform, but was carrying a firearm.  Seeing Sebastian, NEWMAN proceeded to pull a nametag or badge of some kind on his shirt over to the side closest to Sebastian and show it to him through the window.  The tag appeared to indicate that he was from or with the COUNTY Sheriff's Department.

34.     Upon seeing this, Sebastian put down two medication containers he had been holding in his hands on the top of the dresser near the door, with child safety caps still intact, and he then opened the door and stepped outside, closing the door behind himself.  At that time NEWMAN said that he was there, "investigating your complaint against your in-laws for sexually and physically abusing your children."

35.     Sebastian was immediately struck by how odd this seemed, since the original allegations made by his children, had been made over eight months prior, and in addition, six months prior (in August of 2010), a police officer had come to the very same hotel room where his family was staying at this very time, and had interviewed both Sebastian and both of his children.

36.     Sebastian had started to inquire how it was that NEWMAN was now at his door some eight months later, when NEWMAN then apologized, "for the social worker not being here," and he said that, "he" (referring to the social worker) was supposed to be there, and he didn't understand why "he" wasn't there.  Then without another word to Sebastian, without so much as requesting consent, NEWMAN said, "I need to go in," and immediately reached for and opened the hotel room door and walked inside.

37.     When NEWMAN went inside, he commented immediately on the prescription pill containers being on the counter just inside the door. He picked them up and tried the lids, obviously noting that the child caps were safely secure. He asked, "Why are they there?"  Sebastian explained he had to put them there to open the door, whereupon NEWMAN shook his head and said, "o.k."

38.     He asked if there was anyone else in the room, and Sebastian told him that his children were in the bathroom.  They went to the door of the bathroom and Sebastian told the children to come out.  They had gone in the bathroom

when NEWMAN had knocked on the door and said, "warrant sheriff." The children came out of the bathroom and both went to sit on the bed, where they had previously been doing their homework.

39.    At the time of these events, both children were homeschooled through a homeschool organization called Talega Preparatory Academy.

40.    Next, NEWMAN went to the television and turned to the children while turning on the television, saying, "You guys don't have to do homework, just watch some t.v."

41.    Sebastian responded by shutting off the television and saying, "No, they do need to do their homework."

42.    NEWMAN then reached down and turned on the television again, saying, "No, let the kids relax, I have to talk to you, let them just watch t.v." Again Sebastian turned the television off and told him, "No, the kids need to finish their homework!" NEWMAN yet again turned the television back on and insisted that the children be allowed to watch it.

43.    NEWMAN then said, "I heard the children are homeschooled and you haven't immunized them, do you have the records?" Sebastian told NEWMAN that they do home school their children, and that they did not approve of their children having immunizations – pointing out that was his and his wife's right as a parent under California law – and advising NEWMAN they had in fact signed

"waivers" of their right to have their children immunized.  Sebastian began to search for the immunization waivers (authorized under California law) and some of the other documentation of their participation in the Talega Preparatory Academy, including the attendance records they kept on the children, and the registration paperwork.  In doing so, Sebastian made his way over to the refrigerator, upon which the paperwork was kept.

44.     Not wanting the kids to be upset by the presence of the officer, Sebastian told them they could watch t.v. and put their homework to the side.

45.     When Sebastian was at the refrigerator, NEWMAN opened the refrigerator and asked Sebastian, "How come you don't have milk?" NEWMAN had not asked for permission to look in the refrigerator, just like he had not asked for permission to enter the residence.

46.     Sebastian explained to him that Am.L is believed to possibly be lactose intolerant and that for that reason his family only drinks regular homogenized milk rarely, and pointed out they had soy milk right in the refrigerator.

47.     In response, NEWMAN said, "Every child should have milk," and went even further, strangely pontificating about other dairy items the children should have and the virtues of them.

48.     Sebastian showed him the waiver of immunization form from the Talega PreparatoryAcademy which specifically stated that the parents had opted out of

immunizations for personal and religious beliefs.  The form is a standard type of form used by parents when enrolling children in school to express their desire that their children not be given immunizations.

49.     NEWMAN responded, "What are these religious beliefs?"  Sebastian explained to him about the parents having learned that some of the products used to create immunizations come from aborted fetuses and that he and Mirsha were pro life and therefore against the use of immunizations for that reason, as well as that there were many unknowns about the effect of immunizations on children.  To that explanation, NEWMAN replied, "What does that have to do with immunizing your children?"

50.     Sebastian went on to try to clarify and explain their religious beliefs as NEWMAN viewed the attendance records they kept on their children's participation in education during home-schooling, the school registration forms, and the waiver of immunization form Mirsha had signed on behalf of the children, which expressly cited the California law upon which such waivers are allowed, and dealt with a person's religious beliefs as a grounds.  To Sebastian's explanations, NEWMAN responded only, "That's stupid."

51.     NEWMAN then asked Sebastian if Sebastian had schoolbooks and Sebastian opened up the large drawer in the dresser which had nothing but books in it; easily 20 books. NEWMAN looked down, made a scoffing noise,

and seemed to be disappointed that Sebastian was actually able to produce additional books beyond those which were already apparent in the room, where they were laying around on the bed – where the children had been, and were again doing homework - and nightstand.

52.     NEWMAN then turned and walked outside. A few minutes later, NEWMAN came back and for reasons unknown to Sebastian, verbally "re-introduced" himself as if they had never spoken before.

53.     NEWMAN then saw the kids going into the bathroom and said "why are you going there?" Ae.L told NEWMAN he has to go to the bathroom and because he was scared. NEWMAN said, "You don't have to be afraid it's ok, I'm a policemen and will help you and your sister."

54.     The officer then asked Sebastian to come outside, saying he needed to talk to Sebastian.

55.     Once outside, NEWMAN said "It looks like you're having a lot of trouble walking, would you like to sit down on the stairs?"

56.     Once Sebastian sat at the stairs, NEWMAN said, "I'm a really bad note taker so I'm going to record this."  Then NEWMAN put down a recorder in front of them and began to ask Sebastian questions about the sexual abuse allegations made eight months previously.

57.     NEWMAN asked Sebastian, "Why do your in-laws from two doors down (meaning in-laws of the maternal grandparents home where Sebastian, Mirsha, and the children were living when the allegations against Mirsha's brother for inappropriate touching of the children arose) not like your grandparents?" He was obviously referring to Mirsha's parents when he said, "grandparents."

58.     Sebastian told him it was because the in-laws were Jehovah's Witnesses and they didn't like anybody that didn't share their beliefs.

59.     NEWMAN then said that "we" received more than one complaint and it was at that point Sebastian informed him that he had also filed a cybertip about the sexual abuse allegations (a Cybertip is an anonymous online service provided by law enforcement) because DCFS was slow to contact the family after the allegations had been made and to Sebastian's assumption, communicated to DCFS by law enforcement.

60.     NEWMAN then asked Sebastian, "Why did you lie that [the maternal grandparents] owned animals," saying he had spoken to all the maternal grandparents neighbors and they all told him they owned no animals. NEWMAN added that, "If you ask me, if they put tags and collars on them, that's what constitutes ownership."  Sebastian replied that if that was his definition then they do not "own" animals, but there were animals that were

always on the property, and the grandfather did in fact try to kill a cat that Am. L had considered her cat. He had tried to hit it with a piece of pipe for having crapped in his boat.

61.     Sebastian also told him that he felt the same uncle at the grandparents' home against whom the allegations of sexual abuse had been made by the children, had deliberately broken Ae.L's arm, referring to an incident where Ae.L had allegedly fallen off a bed while the PLAINTIFF parents were living on the maternal grandparents property. NEWMAN responded, "That's just your theory and that's something you have to address with the social worker."

62.     During their conversation, NEWMAN was interrupted several times by phone calls for which NEWMAN would shut off the tape recorder and still continue to ask Sebastian questions, then occasionally remember to turn it back on.

63.     Later in the discussion, NEWMAN asked Sebastian, "Didn't you leave because there was bad blood between you and Michael [the uncle]?" Sebastian responded, "No the reason we left was to protect my kids."

64.     NEWMAN then said, "Let's talk about school." NEWMAN asked if Talega is a, "real school?"  Sebastian told him it was indeed a recognized home schooling academy, and that on August 10th, 2010, when sheriff Ballesteros was there investigating the sexual abuse allegations, Sebastian had given her the

same information on Talega Preparatoy Academy, including the immunization waiver.  NEWMAN replied, "Yeah, I read all that in her report."

65.       NEWMAN then said to Sebastian, "Am I going to find proof of this [school affiliation] on the computer?  But before Sebastian could answer, NEWMAN's phone rang again, and when it did and NEWMAN answered it, Sebastian left the steps, went to the open window of the hotel room, stuck his head in asked his children if they were able to reach mom?  The children replied that they had, "called her and called her but couldn't reach her" and that they had left messages.

66.       As they were watching t.v. Sebastian told them they still had to do their homework. So they got it out and started doing it again. Am.L asked, "Is mommy going to come?" Sebastian asked them to give him the phone and he would try to call Mirsha.  Sebastian received the phone, then spoke to the kids for a couple of minutes, and also reached Mirsha, telling her to get home immediately as the police were there at the hotel.

67.       When NEWMAN approached him again and said he wasn't able to reach the social worker that was supposed to come with him and he had to call another one.  NEWMAN had continued to turn his tape recorder on and off.  It was at that point that Mirsha arrived at the hotel.

68.   Mirsha had received the call from Sebastian at approximately 2:20 p.m., and when she arrived at the hotel about 30 minutes later, she initially saw no police cars and thought that the police had left.  The reason is that NEWMAN was in an unmarked police vehicle. She saw Sebastian talking to a man near the staircase outside the hotel room, but he was not in uniform, and based on some unrelated efforts to get a wheelchair repairman out to the hotel to fix a wheelchair used by Sebastian, she initially thought he was talking to a wheelchair repairman.

69.   Mirsha went directly into the hotel room and immediately after entering the room, the children told her that "dad" was talking to the police.

70.   Another 10-15 minutes passed and Sebastian came inside the room. Sebastian told Mirsha that NEWMAN had told him that he had a "warrant," and almost immediately after Sebastian entered the room, NEWMAN again entered the room.

71.   NEWMAN then ordered Mirsha to talk to him, and he led her outside where he said, "I'm detective NEWMAN and I'm here to investigate the allegations of sexual and physical abuse against your children."  NEWMAN then asked Mirsha questions about the homeschooling of the children and the kids generally, and specifically the issue of she and Sebastian declining immunizations.  He did not ask Mirsha at any time about the allegations of

sexual abuse by her brother while the family had lived at the maternal

grandparents' home.

72.     NEWMAN asked Mirsha why they didn't immunize the kids to which

Mirsha responded, "Because of my religious beliefs."  Like with Sebastian,

NEWMAN asked Mirsha what religious beliefs to which Mirsha responded that

she was Catholic and against abortion. NEWMAN asked Mirsha, "What does

that have to do with immunizing your kids?"

73.     Mirsha explained, much like Sebastian had done already, that many

immunizations have the cell line of aborted fetuses and because she and

Sebastian were pro-life, and also explained that their beliefs led them to also be

vegetarians who didn't even buy things that are tested on animals.

74.     In response to Mirsha's explanations, NEWMAN rolled his eyes and

made a face showing his obvious disapproval.  Mirsha then went inside to get

the immunization waiver, the school registration, attendance records, weekly

progress reports and some specific books she had bought to assist her in

developing a lesson plan for the children in their home schooling environment.

75.     Once Mirsha brought those items to NEWMAN, he asked her to step

over near his patrol car, and once there told her, "I'm detective NEWMAN and

I'm here to investigate the allegations of sexual and physical abuse against your

children."  He then told Mirsha that he was going to record their conversation,

and reached into his shirt pocket where he appeared to be turning on a recorder located in his pocket.

76.     NEWMAN went on to tell Mirsha that he had spoken with her father, and her father had said there was "bad blood" between Sebastian and the uncle accused of abusing Ae.L.

77.     Mirsha told NEWMAN that there hadn't really been "bad blood" between them, because they had left the very same day that they had seen her brother grab Am.L's  buttocks in a sexually suggestive manner.  Mirsha explained that a couple of months after they left, Am C. had also told her that the uncle had touched her vagina.

78.     NEWMAN asked her when they had left her parents home and she replied it was in either late February or early March.  The conversation was then said to be complete by NEWMAN, and Mirsha returned to the room. Shortly thereafter, a female law enforcement officer (DOE 1) arrived.

79.     NEWMAN and DOE 1 then again came walking in the room, never once asking for consent for any entry.  They began to immediately search the hotel room further.  They searched on top of the counter in the bathroom area, on tops of tables, opened drawers, opened the refrigerator door and looked inside, opened some duffel bags, removed the lid off the toilet's water closet, and opened some of the boxes in the room. NEWMAN even searched through

Ae.L's pencil box, finding in the box some playing cards that the child had made himself.  NEWMAN then flipped through each card in the pencil box, then opened and looked through a computer bag, and opened and looked in a folder inside the computer bag.  NEWMAN also searched Sebastian's computer without even asking permission to do so.

80.     NEWMAN then openly stated that he found it "suspicious" that they, "can't find anything."

81.     Angered by apparent complete disregard for the family's privacy, Sebastian asked to see the warrant NEWMAN had stated he had when he knocked on the door.  In response, NEWMAN said, "Your wife gave us permission."  Mirsha had never given permission, and had never even been asked for permission.

82.     Mirsha was right outside the room so Sebastian stepped out and asked her if she had given them permission to search, and Mirsha said, "No."  To make this very clear to the defendants, Mirsha went inside and expressly told the officers she did not give them permission.

83.     NEWMAN and DOE 1 then stopped searching, though there was at that point nothing left to search in the small hotel room.  NEWMAN responded to Mirsha's statement by saying, "I can get a warrant in a few hours and the judge wouldn't see that favorably and you could lose your kids forever."  He then said,

"It doesn't matter anyways, because the social worker is coming and she would search the room anyways, and she doesn't need a warrant, so we can either search now or search later."

84.    DOE 1 then asked Mirsha to step outside with her, and when there, asked Mirsha, "Why don't you want us to search the room, are you afraid we're going to find something 'bad'?" She said, "What are you hiding," and then said, "If you have anything illegal in the room and you tell us now, it won't be as bad for you."  Mirsha responded that they were not hiding anything at all, and weren't afraid of them finding anything at all.  DOE 1 then turned and went right back into the room and continued searching.

85.    NEWMAN then asked Sebastian where the medicine was (that he had seen upon entering the room the very first time), because he couldn't find it. Sebastian told him it was on top of the metal shelf that was over five feet from the floor in the room, and within a small plastic toolbox that was locked. Sebastian pointed to the box and told NEWMAN it was in there.  Sebastian had returned the medicine to that storage location while talking with NEWMAN in the room, after NEWMAN had handled them the first time.  Doe 1 reached up and obtained the toolbox, and then went outside of the hotel room.

86.    Right as they exited the room, NEWMAN noticed two laptop style computers lying on the passenger seats in Mirsha's car, which she had parked

directly in front of the room upon arrival.  He turned to Sebastian and said,

"What are those computers in the car?"

87.     Sebastian explained that they were educational computers for the kids,

and also took the opportunity to point out to NEWMAN that there were even

more books for his children in the car, pointing to an area just behind the rear

windshield of the car where a small space exists behind the rear seats.

NEWMAN looked at the books Sebastian had pointed out to him, but did not

respond to the comments about the books at all.

88.     NEWMAN's next response was, "Do you have the receipts for the

computers, and can you account for each of the items in the room?"  Sebastian

was stunned; the officer was apparently accusing him of being a thief, though he

had no criminal record of any kind, and NEWMAN knew that because he had

run Sebastian's criminal history before he responded to the hotel to

"investigate."

89.     Because the toolbox in which Sebastian kept his medication was locked,

NEWMAN told him to open it.  Sebastian, believing he had no choice given the

officers having indicated the social worker could search anything she wanted

without a warrant anyway, and the fact they had continued to search the room

even after it had been made abundantly clear by Mirsha and Sebastian they did

not have permission to do so, Sebastian complied.

90.      Upon opening the toolbox, NEWMAN and Doe 1 took out the medicine and placed it on top of the police car.  Just prior to NEWMAN and Doe 1 gaining access to the box, Sebastian began to realize he was starting to suffer a seizure.  Sebastian suffered from a form or petit mal seizures related to two serious injuries he had suffered in the past, both of which involved trauma to the head.  Therefore, SEBASTIAN asked Doe 1 if he could please have a couple of the pills contained in the medication containers that had been set out on the top of NEWMANS' patrol car.  Doe 1 asked what the medications were for, and Sebastian replied that he has seizures and he was having one right at that moment.  NEWMAN was again on the phone at the time of this conversation with Doe 1.

91.      Doe 1 asked NEWMAN if Sebastian could have the medication, and NEWMAN was heard to say, "I don't care what he takes."

92.      Then Doe 1 indicated she was going to call paramedics to the scene, and placed her hand on her radio transmitter as if to make a call to dispatch for paramedics to come to the scene, however, she stopped and instead began questioning Sebastian about the pill containers, and specifically, she actually stated she found it, "suspicious" that one of the medication bottles said, "Sebastian, Casalta," and yet another said, "Casalta, Sebastian."  She continued to say that it seemed maybe Sebastian was, "doctor shopping."

93.     Sebastian was stunned at her ignorance, and because it had become abundantly clear to him by the manner in which NEWMAN had searched not only his room but small bags and places in the room, that for whatever reason NEWMAN and Doe 1 had decided that either he, Mirsha, or both, were drug addicts of some kind, Sebastian responded to NEWMAN, who had now joined the conversation, that he would take a drug test, "right here, right now." Newman responded, "Oh, you'll take a drug test right now."

94.     Sebastian told him that, "yes, you either take a drug test on me now, or let's drop this subject." Newman declined.

95.     Sebastian believed that Doe 1 had by now contacted paramedics that were in route to his residence and would be able to administer a drug test of some sort, whether it be a blood, urine, or breathalyzer test, so he awaited their arrival in the hopes that passing such a test might lessen NEWMAN and DOE 1's apparent zeal to find drugs or something "wrong."

96.     NEWMAN then began questioning Sebastian about his seizures and his disability, and began asking Sebastian in a sneering tone, how it was that he could take care of his kids if he was, "so disabled?"  Doe 1 also joined in this conversation, asking questions such as, "Don't the medications make you sleepy," and, "If you're sleepy how can you take care of your kids?"  Sebastian simply replied that he was fully capable of taking care of his children.

97.     As the conversation with NEWMAN and Doe 1 was occurring just outside the hotel room door, and right near Mirsha's car, Mirsha came out with a bag and a couple of sweaters for the kids, and put them in her car.

98.     She had asked Sebastian between the questioning by the officers and the searching of her hotel room if the kids had eaten, and Sebastian had explained they were just about going to leave to do that when NEWMAN had shown up.

99.     Believing at this point this was still all happening because – as NEWMAN had claimed – they wanted to know about the sexual allegations involving the maternal uncle, and also believing they had asked just about every question imaginable about that – a second time by the same law enforcement agency - Sebastian and Mirsha agreed she would take the kids and go get something to eat and Sebastian would stay until whatever it was these defendants were doing was over.

100.     However, when Mirsha began to put the sweaters and a bag in her car, while the kids put their shoes on, NEWMAN suddenly said to her, "It looks like you're packing to go?"  Sebastian told him, "Well, we would like to go out and eat."  NEWMAN responded that they were "not allowed" to leave because he wanted to interview them, and they had to wait for the social worker.

101.    Sebastian told NEWMAN that he did not want him to interview the kids, as they had already been questioned by Ballesteros in August, and that they wanted a lawyer present and wanted the defendants to leave.

102.    In response, NEWMAN went into the room, and told the children to come with him, and he put them in the back of the patrol car Doe 1 had arrived in. When Sebastian asked what they were doing, NEWMAN replied, "You're not going anywhere, and I'm holding on to the kids because the social worker is coming here to talk to them."

103.    Despite being told they could not interview the children, and before the social worker or anyone else arrived, approximately 5 minutes after NEWMAN had placed the children in the car, he took them out and began questioning them.

104.    This questioning went on for several minutes, and then he let the children return to the hotel room.  When he did, both children came into the room complaining about how they (referring to NEWMAN and Doe 1) wanted them to change their story and lie. The children were visibly upset, and clung to their parents' legs and hips.

105.    MENDOZA arrived approximately 10 minutes later, and was carrying a large black over-shoulder bag.  She first stopped and talked to NEWMAN for approximately 5 minutes.

106.    The family was in the hotel room at this time, and Sebastian and Mirsha were observing these conversations through the open front door of the home.

107.    Again, without consent or a warrant, MENDOZA entered the hotel room. She immediately began firing off questions along the lines of those already asked by NEWMAN, such as about the family's religion, whether the children were being seen by a doctor, were the children in school, etc… Sebastian told her that he they had just kicked the police out of their home, and that she was not welcome there, going so far as to tell her she was violating his and his family's privacy.

108.    In response MENDOZA began insisting that she be allowed to interview the children. Sebastian told her that he did not want her interviewing the children, and also told her what he had told NEWMAN, that if she interviewed his children he wanted a lawyer present. For a short while, she appeared as if she was not going to pursue the interviewing of the children, and instead turned to asking more questions about homeschooling and immunizations.

109.    Sebastian told her his children are homeschooled trough Talega Preparatory Academy, and he quickly pulled out the registration, attendance records, weekly progress reports, and immunization waivers for both children, all from the Talega Preparatory Academy and handed them to MENDOZA.

MENDOZA only glanced at the paperwork, then placed it into her over-shoulder bag.

110.    In further response to MENDOZA's visible skepticism about the children's education, Mirsha went on to show her the multitude of children's books, worksheets (for tracking their progress and assignments), and also showed her the two educational computers (computers purchased with, and allowing for, the running of educational programs for children).

111.    Sebastian also showed her the drawer full of books in the room, and told her he had already explained this whole "home-schooling" issue, to Deputy Ballesteros on August 10th, to which she replied, "yes I read that."

112.    He also provided her with the same Talega Preparatory Registration documents that he had shown NEWMAN, and MENDOZA actually took them with her, though later testified under oath falsely in juvenile proceedings that he had not been given any documents.

113.    At one point while in the hotel room, MENDOZA suddenly pulled out her cell phone and/or a small camera that resembled a cell phone in size, and began obviously snapping pictures of the room, including the bathroom, sink area outside the bathroom, items on the top of the furniture and refrigerator in the room, and actually opened the refrigerator door and snapped a couple of pictures of the contents of the refrigerator.

114.    MENDOZA then began inquiring about why the parents had not immunized the children, and Sebastian told her it was because of the parents' religious beliefs. She asked Sebastian what were those beliefs, to which Sebastian responded, "because I am Catholic and other personally held beliefs and am against abortion and they use the cell line of aborted fetuses in many immunizations." MENDOZA told Sebastian he had to immunize the kids, and asked, "Don't you know they can die from a disease?

115.    MENDOZA also said she needed the letter that NEWMAN had asked for from the children's doctor explaining the parents' religious beliefs.

116.    She went to the refrigerator, and like NEWMAN, began talking about a lack of "milk" in the refrigerator, saying, "There's no milk, every kid should have milk in the house." Sebastian told her, as he had NEWMAN, we use soy milk, and it's right there in the refrigerator (soy milk comes in a box-like container unlike milk in plastic containers, and shaped differently than major milk company containers not made of plastic).

117.    She asked if the kids had gone to the doctor, and Sebastian responded "yes." She then inexplicably asked Sebastian to lift Am.L's shirt. Sebastian told her "considering what Am.L has gone through  I am not going to lift her shirt." In response to her questions about Am.L having received any medical care, Sebastian told MENDOZA that Am.L had gone to LAC -USC hospital on

December 28th and Ae.L had gone to see a Dr. Grover last year around June or July.

118.     In response, MENDOZA said she had to take the kids to see a doctor, "at her office" and had to transport them in her car.  She gave no explanation for why it was she felt the children needed to see a doctor.  The parents told her "absolutely not."  She then called in NEWMAN and DOE 1, who entered the home yet again, and they removed the children.  Sebastian followed the children to make sure that they would be as calm as possible considering this traumatizing situation.  The office was located in Whittier, California. MENDOZA turned to Sebastian as he walked out of the room with the children, and said, "Can you walk?  You don't look like you can.  I noticed the wheelchair inside; if you're disabled how can you take care of your children? How come you didn't enroll your children in a real school? They need to go to a real school. Is this [Talega] even a real school?

119.     MENDOZA continued with her complaints and questions, saying, "Why didn't you immunize your children?"  Sebastian reitirated their religious and philosophical beliefs. In response, MENDOZA said, "You are a 'bad dad' for not immunizing your children; that has nothing to do with religion."

120.    With the children in MENDOZA's car, thus the parents and children's familial association rights already violated by the removal from their care, the parents followed MENDOZA to her office.

121.    Mirsha and Sebastian were at her office, waiting in the lobby area for about 10-15 minutes when MENDOZA came out and told them that she was "detaining" their children.

122.    Mirsha and Sebastian were stunned, and asked her, "Why are you taking our kids?"  MENDOZA's response was that there was no milk in the house and she repeated what she had said before at the hotel room, "Every kid should have milk in the house."

123.    Sebastian and Mirsha told MENDOZA that they would go get some milk right then if that was the problem," to which MENDOZA simply replied, "no."

124.    Mirsha told MENDOZA that if the problem was with where they were living, give us a referral and we'll go to a shelter right now!  MENDOZA refused to provide such a referral as well.

125.    MENDOZA again began asking about what doctors the children had seen in the past and when, and Mirsha and Sebastian attempted to explain the children's medical history.  They explained that for their son Ae.L, his only "medical history" worthy of mention related to a condition which at that point had only been diagnosed by a doctor as "hip dsyplasia," but which the parents

were pursuing further medical evaluation about to ensure he did not have some other cause for a difference in how he walked.  They also explained that for Am.L the only "medical history" for her had to do with some moderate stomach and digestion problems, and advising they had been told by at least one physician that she possibly suffered from lactose intolerance, which was why they were using soy milk.

126.    Despite having asked for the medical history, after the parents spent no more than a minute trying to relate it to her, MENDOZA said, "I can't write and talk to you at the same time," and she appeared to angrily turn and walk out of the room.

127.    A couple of minutes later, MENDOZA  brought the kids out to the lobby area, the parents hugged their children, and then MENDOZA turned and left with the children.

128.    Mirsha and Sebastian stayed to try to get more information since MENDOZA had never even so much as given them her name or any information as to what was going to happen next with regard to their children.

129.    At their request, a receptionist in the lobby area called a supervisor. PLAINTIFFS are informed and believe that INCHAUSTI then came out to the lobby and spoke with them.  The parents explained that they could not understand what was going on, and how it was that their children were being

detained because of the claim there was no "milk" in the house.  In response, INCHAUSTI said, "That is sufficient grounds."

130.    Like MENDOZA, INCHAUSTI began questioning whether the children had gone to a doctor.  In response to this question, not only did Mirsha and Sebastian tell her that they had indeed been to see doctors, they began pulling out of Sebastian's wallet, and Mirsha's purse, numerous business cards from the doctors and a dentist they had taken the children to, and cards for doctors that Sebastian had seen as well, and finally some of the insurance cards for the insurance companies that covered the children's medical costs.  The parents expressed utter disbelief to INCHAUSTI as to what the basis was for this concern about taking the children to doctors.  They pointed out that they had taken their daughter (Am.L) to a doctor just two months ago. They pointed out as well that there was nothing wrong with their children at that time that would require them seeing a doctor!

131.    The business cards the parents provided to INCHAUSTI had addresses, often e-mail addresses, and phone numbers for each of the professionals or medical organizations on them.  Sebastian also showed INCHAUSTI all of the telephone numbers for doctors and/or medical facilities that were stored on his cell phone.

132.     INCHAUSTI took the cards provided by the parents, came back out to the lobby with sheets from a copier showing she had copied the cards, and she then proceeded to make some notes about what the parents were saying about how and/or why each facility or doctor was involved, and with which child.

133.     Sebastian then began addressing the apparent theme established by the search by NEWMAN and Doe 1, and NEWMAN's questioning of Sebastian, that he and/or Mirsha had or were doing illegal drugs. INCHAUSTI started the topic up again saying there was, "some concern" that the parents were using drugs.

134.     In response Sebastian asked INCHAUSTI if he appeared to be lucid and coherent, to which INCHAUSTI responded, "Yes."  She then said, "But I don't know if you are on any drugs," to which Sebastian replied, "Just like I told the cops, just like I told your social worker, I'm willing to take a drug test right now, tell me what hospital I have to go to and I will head there right now." INCHAUSTI responded, "that won't be necessary." Sebastian told her, "If you guys aren't going to drug test me then you need to stop discussing drugs in their entirety."

135.     At no time, did either MENDOZA or INCHAUSTI, inform the parents of their names or provide any identification of their names, despite numerous requests of each to provide that information.  It was only when INCHAUSTI

came out to the lobby, that she gave the parents the card for MENDOZA, but yet steadfastly refused to give her own name to the parents.

## BETWEEN REMOVAL AND COMMENCEMENT OF COURT

136.    Between the removal of the minor PLAINTIFFS and the first court hearing on February 15th, 2011, the parents were not contacted about allowing visitation with their children nor did they have any visitation with the children.

137.    The parents were never told exactly where their children were placed either, being only told that they would be in the city of Montebello.

138.    The next day (February 11th), the parents returned early in the morning to the Agency office in the city of Whittier, California.  They went to some gentleman in a uniform in the lobby (he appeared by dress, and wearing a badge, to be a security officer of some kind) in the building asking where the children were, seeking clarification for why they took their children.

139.    The man told them to talk to the receptionist, which the parents did, and at some point a lady came out, who then went and got MENDOZA at the parents' request.

140.    When MENDOZA came out, Sebastian again asked her, "Why did you take my kids?"  MENDOZA appeared visibly shaken in trying to provide an answer, and only answered, "Didn't my supervisor tell you?"  The parents told her, "No, it was not explained to us."  He then went on to explain to

MENDOZA how he had given the supervisor INCHAUSTI all of his business cards for the doctors that had seen his children and himself.  MENDOZA was visibly shaken, and she responded to the inquiry again about "why" the children were taken, by saying, "You guys didn't have milk, and that was enough."

141.    Sebastian reiterated that was ridiculous and he wanted his children returned.  MENDOZA refused.  Sebastian and Mirsha began to cry.

142.    At that point MENDOZA said, "It doesn't make me happy to destroy people's lives; I'm not here to destroy people's lives."  Sebastian responded that she was indeed destroying their lives, pointing out he was the one who called them (about the molest) and now they were taking the parents' children and they cannot understand why?  MENDOZA simply got up and left in a huff. She never offered any visitation with the children, and never asked for any possible friends or relatives that could take placement of the children.

143.    The parents were not given any contact information for the children either, and did not even have the opportunity to speak to their children on the phone between their removal and the February 15th, 2011 court date.

144.    At some point between that visit, and the next visit to the Whittier office, someone from the office called the parents saying they needed them to sign medical releases to have their children medically evaluated. The parents advised they would be at the office on Monday morning.

145.    The parents returned to the Whittier office on Monday, the 14th of February, and again met with MENDOZA.  She provided them with numerous forms, one of which constituted a "release" of one kind or another for medical evaluations and/or treatments.  The parents made clear they would not sign the release that said the Agency could provide the children with medical treatment, to the extent that among the things listed the Agency could do, it included immunizations.

146.    The parents agreed to sign the release, however, they specifically told MENDOZA they would not agree to inoculations, and they interlineated that authorization point on the form, and initialed next to the interlineation. They then signed the form.

147.    There were other forms the parents were asked to sign, and the parents said they did not agree to sign any of the other forms.  They advised they came down there for the limited purpose of allowing them to get whatever information they felt they needed from the medical doctors.

148.    Parents were also given "referrals" by MENDOZA for a drug test for each parent to take.  The parents went down that very day to do the drug tests, and although Mirsha was allowed to test the referred facility.  However, for some reason associated with the facility's problems with Sebastian's form of identification, the facility would not accept his I.D. (a picture I.D. issued from

the COUNTY's transportation department – related in part to Sebastian's disabilities), and refused to give him a drug test.

149.    The parents returned to MENDOZA's office that same day, and Sebastian was upset that she had wasted their time sending them to a place with some identification requirement that was not satisfied by the identification he carried, because he had shown MENDOZA his identification when he had been at the office previously. MENDOZA then took Sebastian's picture and formulated some document that she indicated would allow the drug testing to continue.

## THE ORIGINAL JUVENILE PETITION AND DETENTION REPORT

150.    Defendant HOLQUIN prepared a Welfare & Institutions Code Section 300 Petition that was filed with the juvenile dependency court in the County of Los Angeles on or about February 15th, 2011.

151.    The original Petition contained allegations that were completely false, and HOLQUIN made the allegations, sworn to under penalty of perjury, without having personally investigated a single issue, fact, event, or circumstance of the case, and without any knowledge as to the truth, accuracy, and/or falsity of the following allegations in the original Petition;

b-1
The children [Ae.L] and [Am.L's] mother, Mirsha Lopez and father, Sebastian Casalta created a detrimental and endangering home environment for the children in that the mother and father failed to

provide the children with sufficient nourishing food. On *02/10/11,* the home was found to have no food. The refrigerator only contained moldy and uneatable food. Such a detrimental and endangering home environment established for the child by the mother and father endangers the children's physical and emotional health and safety, and places the children at risk of physical and emotional harm and damage.

b-2

The children [Ae.L] and [Am.L's] mother, Mirsha Lopez and father, Sebastian Casalta medically neglected the children by failing to provide the children with necessary well-child medical examinations and age-appropriate immunizations. Such medical neglect of the children on the part of the mother and father endangers the children's physical and emotional health and safety and places the children at risk of similar physical and emotional harm, damage and medical neglect.

152.    MENDOZA and INCHAUSTI, in conjunction with the filing of the original Petition, and intended by them for review by the court at the first court hearing (referred in juvenile dependency proceedings as the "Detention Hearing") and provided to the court prior to that hearing, filed a report (signed on February 11th) on or about  February 15th, 2011.  It is entitled a "Detention Report," and was signed under penalty of perjury, yet was replete with lies, misrepresentations, and the exclusion of exculpatory information.

153.

-   the children were at  "High Risk" for future abuse if [they] reside[ ] in the home of parent.

 - the primary caregiver was "providing inconsistent with the child[ren]'s needs.

- the "caregivers" have a "high flight risk" and are "likely to flee the jurisdiction of the court.

- The children were interviewed "privately" with "mother's consent."

- Mother "could not show CSW Mendoza any books or materials indicating that the children are being properly homeschooled," and, "[M]other didn't have any paperwork from the school district indicating homeschooling."

- The refrigerator didn't have any food that is suitable for children their age.

- There was no milk, cereal, fruits or vegetables visible.

- The refrigerator was basically empty as the food in it appeared old and uneatable.

- Mother indicated that the children have not been seen by a doctor and therefore could not provide information. When mother spoke with father she indicated that her children had recently been seen but could not provide the information of the doctor at the time of this interview.

- The detective NEWMAN was later reported to have stated [to MENDOZA] that in his presence father started taking stuff out of the freezer and putting it in a bag. The detective stated that when he checked the bag father had put moldy food inside the bag. The detective stated that father also started cleaning up the room.  NEWMAN later, in juvenile proceedings, testified under oath he had never seen these things occur, and had made no such statements to MENDOZA, however MENDOZA testified and/or put in juvenile court reports just the opposite.

- The detective stated [allegedly to MENDOZA per her reports to the court] that he has been trying to track the family since the allegations of sexual abuse came in early September, however, every time [the police] close in the family moves.

- Detective NEWMAN told MENDOZA to call father Sebastian's doctor, James L. Caplan, M.D. 250 N. Robertson Blvd., #606, Beverly Hills, CA 9021 J (310) 385-3385, because when the police "cross referenced" – which PLAINTIFFS are informed and believe simply means in actuality the officers actually only "looked at two different pill containers provided by father" - they found that father simultaneously gets the same prescription from two different doctors, it was explained by Sebastian to both NEWMAN, MENDOZA, and Doe 1, that father goes to different doctors for different conditions and therefore it appears as though he is getting more medication than he needs."

- Father indicated that the children have been seen by a pediatrician. He said his son was seen two weeks ago, however, he did not have the name or the location of the pediatrician at the time of this interview.

- Father indicated that there is lack of food in the home because he had just thrown out all the food prior to CSW's arrival.

- The child[ren] indicated that [they] had pop tarts and crackers to eat all day

- [The Agency/MENDOZA was [u]nable to provide reasonable efforts [to avoid removal of the children].

The Detention Report ended, with recommendations for mental health and/or medical evaluation services to two unknown children – not the children of Mirsha and Sebastian.

**THE DETENTION HEARING FEBRUARY 15TH, 2011**

154.    Among the specific lies and misrepresentations included in the Detention Report – this list is not exhaustive - were the following items;-  At the Detention Hearing held February 15th, 2011, the juvenile court was provided the original Petition and the Detention Report.  Finding the allegations constituted a "prima facie" case for the proposition that the children were children described by Welfare & Institutions Code Section 300(b), based on the Petition and the Detention Report, the court ordered the children remain separated from their parents, and set the matter for a jurisdiction trial (also known as an "adjudication" in L.A. County juvenile court parlance), on March 7th, 2011.

155.    Thereafter, on or about March 7th, 2011, PATEL and/or SOSA filed a 1st Amended Petition.  In the 1st Amended Petition, PATEL  swore under oath as to the original ("b-1" and "b-2" allegations), and added her own allegations which were also completely false.  PATEL had never investigated in any manner with either Sebastian or Mirsha any of the allegations from the original Petition, or those she added to the 1st Amended Petition, prior to filing the 1st Amended Petition.  The 1st Amended Petition also had certain boxes checked that

reference language required by the W&IC 300 statute, which language is to

specify on what factual circumstance/condition/event, the "child[ren] ha[d]

suffered, or there is a substantial risk that the child[ren] will suffer, serious

physical harm or illness."  Even the checking of the boxes – for the language the

checked box referenced - was a fraudulent and malicious representation without

any basis in fact and/or made with reckless disregard for the truth or falsity of

the allegations.

156.    The additional allegations in the 1st Amended Complaint were as

follows;

> b-3
> The children [Ae.L] and [Am.L'] mother, Mirsha Lopez and father,
> Sebastian Casalta educationally neglected the children by failing to
> enroll the children in school or providing a home-school education. Such
> educational neglect of the children on the part of the mother and father
> endangers the children's physical and emotional health and safety and
> places the children at risk of similar physical and emotional harm,
> damage and neglect.
>
> b- 4
> The children [Ae.L] and [Am.L'] father, Sebastian Casalta has untreated
> mental health issues that include the father experiencing episodes of
> auditory and visual hallucinations. During the father's episodes, the
> father yells at the children and throws things in the children's home. The
> father refuses to seek psychiatric care for his mental health issues. The
> children are fearful of their father. The mother, Mirsha Lopez knew of
> the father's mental health issues and the dangers his condition poses the
> children, yet the mother failed to take action to protect the children. Such
> untreated mental health issues and failure to protect the children on the
> part of the mother and father endangers the children's physical and
> emotional health and safety and places the children at risk of similar
> physical and emotional harm, damage and neglect.

b-10
The children [Ae.L] and [Am.L'] [ ] father, Sebastian Casalta abuses
prescription medication. The father's prescription medication abuse
impairs his ability to safely care for the children. The mother knew about
the father's addiction to prescription medication, yet the mother allowed
the father unlimited access to the children. The father's drug use and the
mother's failure to protect the children endangers the children's physical
and emotional health and safety and places the children at risk of similar
physical and emotional harm, damage and neglect.

## THE "MAT REPORTS"

157.    As part of the juvenile court process, PATEL, SOSA, and/or additional

unknown DOE defendants 2 - 10, sent the children through a process with what

is known as the "Multidisciplinary Assessment Team," an organization

described on a DCFS website as;

> "Multidisciplinary Assessment Teams (MAT) is an exciting
> collaborative effort between the Department of Children and Family
> Services (DCFS) the Department of Mental Health (DMH), and other
> community providers. It is designed to ensure the immediate and
> comprehensive assessment of children and youth entering out-of-
> home placement."

158.    This organization is used routinely by COUNTY/DCFS as a "mental

health evaluation" provider for children, which mental health evaluation is done,

and was done in this case, without notice to, or consent of the parents.

PLAINTIFFS are informed and believe, and thereon allege, that the routine

assignment of children in the care, custody, and control of DCFS for "mental

health evaluations," without prior notice or consent of the child[rens] parents, is

yet another of the policies, practices, and/or procedures of COUNTY that evidence a deliberate indifference to the rights of the parents and safety of the children.

159.    CAMPBELL was the Marriage and Family Therapist intern with MAT, that was assigned to the family/children.

160.    CAMPBELL then performed her "evaluation" of the children, and prepared a report for the court not unlike a social workers Detention or Jurisdiction Report, and CAMPBELL was well aware that the juvenile court would place significant emphasis on the things she said about the children, and about her recounting of involvement with the parents and the children.

161.    With full knowledge of the court's emphasis on what she would put in her report in terms of decisions to be made about placement of the children, in the "MAT Report" that CAMPBELL then filed with the court, she made numerous false statements and misrepresentations of fact, all of which were designed to cast the parents in a false light, and to further the efforts of DCFS to keep the parents separated from their children.

162.    CAMPBELL very specifically lied about the content of conversations with the PLAINTIFFS  parents during a court ordered visitation, and about things said by the foster provider for the children during their initial stay in COUNTY/DCFS custody.  PLAINTIFFS fortunately taped the entire

conversation between themselves and CAMPBELL, and presented same in the juvenile proceedings.

163.    This practice of using MAT to further the agenda of COUNTY/DCFS in keeping parents and their children unnecessarily separated, is a practice of which PLAINTIFFS are informed and believe is undertaken with deliberate indifference to the 14th Amendment familial association rights of the family members.

164.    In the juvenile jurisdiction trial proceeding that finally took place commencing May 17, 2011, CAMPBELL proceeded to take the stand and lie under oath about conversations the parents had with the children, about interactions in visits, and about things the children reportedly said.  She included numerous false statements she attributed to the foster mother for the children as well, each of which the foster mother denied, and each of which was again negative in content or connotation to the reunification of the parents with the children.

165.    In making the false statements, CAMPBELL participated in the conspiracy to maintain the separation of the children from their parents, which all other individual defendants had commenced after the removal of the children from their parents.

166.     As a result of the lies, misrepresentations, fabrications, and repeated failures to include exculpatory information in Petitions and reports submitted to the juvenile dependency court, it was not until the conclusion of the juvenile dependency court jurisdiction trial on June 21, 2011, that the minor children were returned to their parents.

## MEDICAL TREATMENT WITHOUT NOTICE/CONSENT

167.     During the pendency of the juvenile dependency court process the parents were subjected to up until June 21st, 2011, as a result of the removal of their children, PATEL, SOSA, and/or other yet unknown defendants (Does 2 - 10) subjected the minor PLAINTIFFS to invasive medical examinations and procedures, including but not limited to, 1.) the administration of inoculations to the children in violation of the parents express statements that their children were not to be immunized and in fact specifically withholding consent for immunizations of the children in writing provided to DCFS, 2.) x-rays, 3.) dental examinations and procedures, including the use of mercury fillings in the children's teeth, and 4.) mental health evaluations of the children.

## HOLDINGS ON JUNE 21ST, 2011

168.     At the hearing on June 21st, 2011, when the children were returned, it was done so over the objections of the COUNTY's attorney representing DCFS, Ms. Fimy Aghoian. Further, the juvenile dependency court judge Timothy

Saito made a single allegation finding which was an "edit" of allegation b-4, which this esteemed jurist crafted on his own.  At least by the presumption of a rule of law being followed in juvenile court proceedings it came from the evidence, and was stated to be as follows;

> "The children Ae.L and Am.L's father Sebastian [Xoss] exhibits mental and emotional problems including audio and visual hallucinations, such as seeing rabbits, magicians, and elephants talking to him. During some of these episodes the children have expressed being fearful.  Father refuses to seek health care for his hallucinations.  Such display of mental and emotional problems by the father places the children at risk of harm.  Supervision is ordered."

169.    The foregoing statement by a judicial officer of the State of California actually was made in this case. It was made despite the testimony of Sebastian's treating psychiatrist and in contravention of Judge Saito's version of events. Sebastian's attorney at the time ( the only expert who testified on issues of Sebastian's mental health.

170.    The court indicated it was making what is commonly referred to as a "360(b)" finding, which comes from Welfare & Institution Code Section 360; a finding also commonly referred to as an "informal supervision" order.  This meant that the court found the children were "described" by a provision of the W&IC 300 – in this case subsection "b" – but they did not come within the jurisdiction of the court; they were not "dependents" of the court.

171.    The finding still meant that the COUNTY's DCFS social workers could access the family and for lack of formal legal terminology, "check on them," or as the Honorable Timothy Saito put it, they were to be, "supervised."

172.    It was worked out off the record, between all counsel present, that the social worker – whichever would be appointed to the case since it was now post-jurisdictional trial and in COUNTY's DCFS organization that meant a new social worker would be assigned – would be allowed access to the children to speak with them and check in on the family on a monthly basis.  Ms. Aghoian herself noted the visitation of the social workers would be, "monthly contact" at the hearing when speaking on the record.

173.    A discussion was then held off the record, in which it was agreed that the social workers would not simply arrive unannounced, but would contact the family first to schedule a visit.  All parties agreed, even minor's counsel, which court appointed counsel have a social worker with their own office check in on and interview the children, and who also did schedule one visit through the parent's counsel a bit before the eventual review hearing.

174.    Also occurring at the hearing, was that the Honorable Judge Saito, refused the "Case Plan" that Ms. Aghoian wanted the court to adopt in its entirety, and said clearly and multiple times despite Ms. Aghoian's arguments he needed to create some "case plan," that he was only going to "recommend" to

the parties that Sebastian participate in a mental health evaluation or assessment. At no time did the court "order" Sebastian to participate in a mental health evaluation or assessment.

175.    A "review date" was set for December 20th, 2011, at 8:30 a.m.

**PLAINTIFFS FILE THEIR INITIAL GOVERNMENT TORT CLAIM**

176.    June 27th, 2011, the PLAINTIFFS filed their first Government Tort Claim (G.C. 910, et seq.) notice on the County of Los Angeles, informing COUNTY of their intention to file suit against the COUNTY for the violation of their civil rights in the removal and continued detention of their children, the unauthorized and unnoticed (to the parents) medical procedures and services given to the children, as well as the unlawful search and seizure of their residence that accompanied the removal.

**CONSPIRACY OF RETALIATION COMMENCES**

177.    Almost immediately after, on June 24th, 2011, another social worker became in involved with the family on behalf of DCFS, as noted herein above would occur.  Her name was Stacy Pipes-Mason.  Before the matter would be fully and finally concluded and the case dismised, there would end up being no less than nine different social worker personnel (case carrying and/or supervisors) of DCFS involved in the dependency matter involving this family.

178.     Pipes-Mason immediately ignored the agreement reached between all parties to contact the parents in advance of a visit to the home, and made an unannounced visit to the home almost immediately upon receiving the assignment of the case.

179.     When she arrived, the children were outside playing under their mother's supervision and she proceeded to visit and speak with the children at that time. The visit was brief, the children appeared healthy and happy, and she noted no areas of concern.

180.     She then asked to enter the home, however, Sebastian refused her access, as her purpose of visiting with the children had been satisfied.  In the discussion with father about her entering the home, Pipes-Mason contended that she had to visit the home twice per month, which contradicted the once per month visit understanding that had been reached between all parties at the June 21st, 2011 hearing.

181.     Sebastian informed Pipes-Mason of two facts about the visits from social workers from the discussions held in court, advising her that, 1.) it was agreed there had to be some advance notice, and, 2.) the visits were to occur only once per month.

182.     On July 6th, 2011, Pipe-Mason again came to the home unannounced again, and this time began claiming that Sebastian was ordered to complete a

mental health evaluation / assessment, saying it had been "ordered" by the court. She also presented Sebastian with a "Case Plan," despite the fact that Aghoian had stridently urged that the court approve a "Case Plan" she had brought to the June 21st, 2011 hearing, and the court had refused.  Sebastian told Pipes-Mason there was no such order made for a Mental Health Evaluation, and said he would have to run the Case Plan document she wanted him to sign by his attorney before he signed anything.

183.    It is unknown to PLAINTIFFS if this was the same "Case Plan" that Aghoian had urged the court to sign at the hearing on June 21st, 2011, as she never provided the one she was urging the court to accept at the hearing, to any other counsel in advance of or at the hearing.

184.    As Pipes-Mason's response to Sebastian's earlier claiming there was no Mental Health Evaluation order by the court, she provided the parents and/or their counsel with what appeared to be a Minute Order from the June 20th, 2012 proceeding, and indeed it did indicate the court had, "ordered" such evaluation.

185.    Sebastian immediately contacted his attorney to advise of the error in the Minute Order, and by July 8th, 2011, counsel for Sebastian and all other counsel in the juvenile proceeding had worked out an agreement to stipulate to a correction of the minute order to reflect the fact no such evaluation had been ordered by the court.

186.    Counsel for the father Sebastian prepared the Stipulation, it was circulated to all counsel (Aghoian – DCFS Counsel, Valles – children's counsel, Williams – mother's counsel), and all counsel signed it.  The stipulation was then sent with a proposed Order to correct the Minute Order nunc pro tunc to the court.  The court agreed and signed the Order.

187.    At the July 6th, 2011 visit to the home, Pipes-Mason was again advised by Sebastian of the agreement that social workers would not make unannounced visits to the home, and Pipes-Mason agreed not to do so, and thus scheduled a visit for the 20th of July, 2011.  Again she came on that date, and like the two visits previous, there were no evident problems with the children or the home.

188.    On July 26th, 2011, Ms. Pipes-Mason sent a letter, saying the PLAINTIFFS' case was being transferred to another "unit" due to where their home was located, but the letter also incorrectly stated that there was to be two visits per month.

189.    Another social worker, Kim Chau was apparently assigned the case after Pipes-Mason, and through phone calls and messages attempted to arrange with Mirsha for a visit.  The visits were by then being described even by the social worker in her phone messages to Mirsha as "monthly visits." This was what had been agreed upon in court, and the parents began to believe they would no longer be subjected to visits more than once a month.

190.     This sign the new social worker understood that, was welcomed by the parents because Ae.L and Am.L had been traumatized by the removal from their parents by social workers in the first instance and were frightened every time such "meetings" had to take place.

191.     However, when Ms. Chau attempted to reach Mirsha on 8/12/11 and didn't reach her, she just went over to the PLAINTIFFS' home unannounced. No one was home however, to answer the door for her unannounced visit.

192.     On August 14th, 2011, Mirsha returned the call from Ms. Chau and left a message wherein she offered to have her visit on August 16th, 2011.  Ms. Chau did not respond, and on August 16th, 2011 no one showed from DCFS for the visit.

193.     Thereafter, a visit was arranged between the parents and Ms. Chau for a visit on August 31st, 2011, at 5:00 p.m. That date and time came, and again Ms. Chau did not arrive, so at about 5:20 the family left to get dinner. The parents later learned the social worker Chau had been a half an hour late coming to their home.  They found this out when they returned and found a note from Ms. Chau on the door, and they noted with alarm that Ms. Chau was referring to the need to do a "second home visit appointment for this month."  It appeared the dispute as to how many visits were to occur every month had still not been solved.

194.    Next, Stacy Holland (male) became the social worker on the case. He was told when the matter was initially sought by unknown supervisory personnel, that it was desired that his "team" take on the entire matters/work to be done with the family.

195.    The parents were unaware initially, that Mr. Holland was in fact the "supervisor" of the previous social workers, but Mr. Holland let that be known at the end of the first visit, or beginning of the second visit to the PLAINTIFFS' home.

196.    Mr. Holland was the first social worker to regularly attempt arranging visits in advance, and a pattern was established wherein he would contact Sebastian's counsel, exchange dates for a visit, and the visit would be confirmed and he would conduct the visit. Stacy Holland did not ever note any concerns about the children during any of his visits to the PLAINTIFFS home.

197.    When Mr. Holland, who was the supervisor to whose unit the Casalta/Lopez matter had been assigned at approximately the end of August 2011, received the case, he was aware from his own review of the file that there had been no court order for a Mental Health Assessment of Sebastian. He also knew there were no court orders on the frequency of the visits to the PLAINTIFFS home, but was acutely aware from review of the prior social workers Delivered Service Log entries, that certainly the PLAINTIFFS were

contending only one visit a month, and no unannounced visits, had been agreed upon back at the hearing on June 21st, 2011.

198.    Due to various reasons, the hearing on December 20th, 2011 had to be continued.  One reason, was that no "report" from DCFS was prepared in advance of the hearing and provided to all counsel and the court, nor was one provided at the originally scheduled hearing.  The matter was then continued to January 21st, 2012, but was continued again by agreement of all counsel and the court, to February 25th, 2012.

199.    Thereafter, on or about January 24th, 2012, FERNANDEZ prepared and signed a 360(c) Petition, seeking to have the court (among other things) find jurisdiction over the children and declare them "dependents" of the court. FERNANDEZ did so without having personally performed any investigation - of any kind - into the allegations contained in the 360(c) Petition she signed under penalty of perjury.  FERNANDEZ never spoke to either parent, or either child.

200.    At or about the same time, ALVAREZ and SOSA prepared and signed a "Detention Report," to go along with the Petition, in practice to explain the reasons why DCFS was asking the court to assert jurisdiction over the children and declare them dependents of the court.

201.    These Detention Report and Petition filings are typically the first formal step in the juvenile dependency court process after a child[ren] are taken from their parents.  This filing of a 360(c) Petition is the functional equivalent of a W&IC 300 Petition but is used when the family is already involved with CPS, and the DCFS agency intends to claim that a previously determined "disposition" of the court (in this case, the return of the children to the adult Plainiffs, on June 21st, 2011), was "ineffective in ameliorating the situation requiring the child welfare services."

202.    PLAINTIFFS are informed and believe, and based on such information and belief, allege that the preparation of the documents aforesaid, and filing with the juvenile dependency court, were the tangible result of a conspiracy between ALVAREZ, SOSA, FERNANDEZ, and other unknown Doe defendants (2 - 10), undertaken in retaliation for the PLAINTIFFS intention to sue the COUNTY and employees of the COUNTY, for the violation of their rights.

203.    At about the same time the new 360(c) Petition and Detention Reports were filed, ALVAREZ, in a "Disposition Report" he prepared in consultation with SOSA, and which both signed, was also presented to the court.  The Disposition Report, is a report intended to "report" on the status of the family to the court, and any issues that may have arisen post the jurisdiction trial that concluded with the return of the children on June 21st, 2011.

204.    The Petition signed by FERNANDEZ falsely alleged as follows;

On June 06, 2011, the Court sustained a petition pursuant to Welfare and Institutions Code Section§300 b in the above captioned matter. The Disposition pursuant to Welfare and Institutions Code Section § 360 (b) has been ineffective in ameliorating the situation requiring the child welfare services in that the children, Aeylias Lopez and Amalay Lopez' father, Sebastin Casalta failed and refused to obtain a Juvenile Court ordered Mental Health Assessment and Mental Health Treatment for the father's sustained mental and emotional problems. The father and mother, Mirsha Lopez, failed to cooperate with DCFS and rarely made the children available to DCFS. The father's failure to obtain a Juvenile Court ordered Mental Health Assessment, failure to obtain Mental Health Treatment and the mother and father's failure to cooperate with DCFS endangers the children's physical health, safety and well being, creates a detrimental home environment and places the children at risk of physical
harm, and damage.

205.    FERNANDEZ knew that there had been no order by the juvenile court for a Mental Health Assessment, much less Mental Health Treatment for Sebastian, and that any order the court had made, had not occurred on June 6th, 2011.  He also knew that the statement the parents had "failed to cooperate" with DCFS was false, and/or he made such statement under oath with reckless disregard for the truth or falsity of them.  Despite knowing these statements were false, FERNANDEZ knowingly submitted these false statements to the juvenile court and copies were served on the parents counsel.

206.    PLAINTIFFS are informed and believe, and thereon allege, that SOSA was FERNANDEZ's supervisor, and participated in some meaningful way in

the preparation of the false allegations in the Petition prepared by

FERNANDEZ.

207.    The Disposition and Detention Reports falsely alleged the same basic

claims as contained in the aforementioned Petition.  ALVAREZ and SOSA

included in the Disposition Report, however, the following requests for the court

to order;

> 1 – That Sebastian sit for an Evidence Code 730 psychological and psychiatric evaluation,
> 2 – That Sebastian participate in therapy with a licensed counselor to address "case issues[?]" and "anger management."
> 3 – That Mirsha participate in therapy with a licensed counselor to address "case issues[?]"
> 4 – That Sebastian and  Mirsha participate in and complete a DCFS approved "Parent Education" program.
> 5 - That Ae.L and Am.L receive "appropriate mental health services."
> 6 - That the children be declared dependent children of the Court.
> 7 - That the matter be continued to 7/25/2012 for a, "364 Status Review Hearing."

208.    Thus, DCFS was attempting to maintain dominion over the family, until

at least July 25th, 2012; one year and more than five months after the family had

been needlessly separated and interfered with by DCFS.  When the parents read

these claims upon receipt of the Petition, Detention, and Disposition reports, and

desired rulings aforesaid, they were emotionally distraught and suffering severe

emotional distress.

209.    In the Detention Report, ALVAREZ and SOSA asked the court to order

a "mental health and/or developmental assessment of the children."

210.    The basic aim of the conspiracy between SOSA, FERNANDEZ,

ALVAREZ, and unknown other defendants (Does 2 - 10), was as follows;

> 1.) avoid the dismissal of the dependency case under a "360(b)" finding, where jurisdiction was never exerted, based on flawed thinking that if jurisdiction had been or could be sustained, it would in some way "protect" DCFS from the lawsuit (this lawsuit),

> 2.) file another W&IC 300 Petition (called a "360c Petition" in the status of the case at that time) alleging – falsely – Sebastian's failure to comply with a court ordered mental health evaluation and the parents lack of cooperation in allowing social worker visits, despite knowing these claims to be false, and despite knowing the parents had cooperated with each and every scheduled visit to their home by social workers where a social worker actually cooperated in scheduling the visit,

> 3.) the defendants hopes was that such filings and any delay in resolving the matter would help avoid the children themselves filing suit against COUNTY and the social worker defendants for the actions they took, because the children would remain under the "supervised" status the court had originally imposed on June 21st, 2011 and thus could not file suit by and through their parents.

211.    Thereafter on February 29th, 2011, social worker Holland again stopped

by the PLAINTIFFS' home for a visit.  He immediately expressed his confusion

and concern for what had occurred in court, and the filing of the new Petition.

He told the parents it was the most "outlandish" Petition he had seen in his 14

years as a social worker.

212.    He explained that when he was advised of the Petition and reports that

had been filed, in a communication and/or meeting he attended with then

County Counsel on the case, Christine Legaspi, he bombarded her with

questions about what had been submitted and expressly told her, "[it is] not going to go anywhere" and that they were, "just going to waste the time of the courts." He acknowledged that the DCFS believed it was doing what it felt it had to do to, "protect itself."

213.    Holland told the parents that he was going to insure his input in the next report to the court before the next hearing (a hearing had been set at the February 25th, 2012 hearing to hear a demurrer to the Petition to be prepared by mother Mirsha's counsel), and advised that if he had to drive the report down to the court clerks himself to insure it was put into the record, he would do so.

214.    PLAINTIFFS do not know what, if anything, Holland did thereafter, but when they appeared in court again to address the demurrer, the PLAINTIFFS learned that not only had DCFS filed a written Opposition to the demurrer, but they indicated therein that even if they lost on the demurrer (resulting in dismissal of the case), they wanted the opportunity to amend the Petition yet again to see if they could come up with allegations sufficient to continue in their effort to extend jurisdiction over the children.

215.    The juvenile court heard the mother Mirsha's demurrer to the new Petition on March 8th, 2011, and dismissed the case in its entirety.

216.    PLAINTIFFS had filed an Appeal to the California Court of Appeal, 2nd District, of the original June 21st, 2011 W&IC 360(b) ruling by the juvenile

court.  However, when the juvenile court sustained Mirsha's demurrer and dismissed the case, COUNTY/DCFS promptly submitted the fact of the case being dismissed to the Appellate Court seeking to declare the Appeal "moot."

217.    The 2nd District obliged the request to declare the matter "moot," thus depriving the parent PLAINTIFFS of an appellate review.  However, the 2nd District did comment, "There is no adverse finding as to Mirsha at all and no finding of abuse as to Sebastian."

## IV.

## DAMAGES

218.    As a result of the conduct of DEFENDANTS, PLAINTIFFS suffered severe emotional distress, anxiety and general damage to their psyche, to such an extent as to cause physical manifestations of pain and symptoms of nausea and severe depression, including but not limited to sleeplessness, headaches, fatigue, malaise, irritability, inability to focus, a generalized fear of authority figures and social workers, loss of appetite and loss of weight.  Sebastian's seizures, related to two prior accidents that caused serious injury to his head, were grossly exacerbated in strength and frequency by the stress of the removal of his children and continued separation from them, further exacerbated by the lies and misrepresentations he read in reports submitted to the court talking about he and his family, as well as the overall malicious and punitive treatment

he experienced from defendants as to himself and his family.

The incident also caused humiliation and embarrassment and loss of reputation in the community to PLAINTIFFS, caused the incursion of medical fees, therapy fees, and expenses related thereto, and is likely to cause the incursion of further medical, therapy, and/or counseling fees in the future as well as expenses related thereto.

219.    PLAINTIFFS are informed and believe, and thereupon allege, that they were placed on various state and local database registries for perpetrators of child abuse, further damaging their reputation and likely causing damages in the future in their rights of membership, society, community participation, and association.

220.    PLAINTIFFS seek an award of exemplary (punitive) damages under federal law and pursuant to California Civil Code §3294 to make an example of and punish the individually named non-entity defendants, and in the hope of deterring future conduct of a similar nature.


//


//

# V.

## CLAIMS FOR RELIEF

## 1st CLAIM FOR RELIEF
Violation of 4th Amendment – Entry
[Plaintiffs v. Newman, Mendoza, Doe 1]

221.    PLAINTIFFS re-allege and incorporate paragraphs 1 through 217, inclusive, as though fully set forth at this point, as they relate to a cause of action for a violation of PLAINTIFFS' civil rights under the 4th Amendment to the United States Constitution, with regard to the warrantless entry into PLAINTIFFS' residence by NEWMAN and MENDOZA, and DOE 1.

222.    PLAINTIFFS allege the entry into their residence was undertaken without consent, probable cause, a protective custody warrant, or exigent circumstances justifying NEWMAN and MENDOZA's, and DOE 1's entry.

223.    PLAINTIFFS re-allege paragraphs 218 through 219 as said damages relate to a cause of action for a violation of their civil rights for the warrantless entry into their home.

224.    The punitive damage allegations of paragraph 220 apply in this cause of action as against NEWMAN and MENDOZA for the violation of Plaintiffs' rights as stated.

//

## 2nd CLAIM FOR RELIEF
### Violation of 4th Amendment – Search
### [Plaintiffs v. Newman, Mendoza, and Doe 1]

225.    PLAINTIFFS re-allege and incorporate paragraphs 1 through 217,

inclusive, as though fully set forth at this point, as they relate to a claim for relief

against NEWMAN, MENDOZA, and DOE 1 for the unlawful search of

PLAINTIFFS' residence separate and apart from the unlawful entry into the

PLAINTIFFS' residence.

226.    PLAINTIFFS allege the facts and circumstances set forth hereinabove

with regard to the unlawful search of the PLAINTIFFS' home by NEWMAN,

MENDOZA, and DOE 1, was undertaken without consent, probable cause, a

search warrant, or exigent circumstances.  Said search violations include

specifically, but without limitation, the search of PLAINTIFFS' residence by

NEWMAN and DOE 1, and the photographing of the PLAINTIFF's home by

MENDOZA.

227.    PLAINTIFFS re-allege paragraphs 218 through 219 at this point as said

damages relate to a claim for relief for the unlawful search, as stated.

228.    The punitive damage allegations of paragraph 220 apply in this claim for

relief to NEWMAN, MENDOZA, and DOE 1, for the violation of Plaintiffs'

rights as stated.

### 3rd CLAIM FOR RELIEF

Violation of 4th & 14th Amendment – Seizure by Interrogation
[Plaintiffs v. Newman, Mendoza]

229.    PLAINTIFFS re-allege and incorporate paragraphs 1 through 217, inclusive, as though fully set forth at this point, as they relate to a claim for relief for a violation of PLAINTIFFS' familial association rights under the 14th Amendment to the United States Constitution, against NEWMAN and MENDOZA, by virtue of the interrogation of the PLAINTIFFS' children over the PLAINTIFFS' objection, and the 4th Amendment to the United States Constitution as to the violation of the minor PLAINTIFFS rights from the same conduct.

230.    PLAINTIFFS re-allege the interrogation of their children was undertaken without consent, probable cause, a warrant, or exigent circumstances justifying interrogation of the minor children.

231.    PLAINTIFFS re-allege paragraphs 218 through 219 as said damages relate to a claim for relief for a violation of PLAINTIFFS' civil rights for the unlawful interrogation of the minor children.

232.    The punitive damage allegations of paragraph 220 apply in this claim for relief to NEWMAN and MENDOZA for the violation of PLAINTIFFS' rights as stated.

//

## 4th CLAIM FOR RELIEF
### Violation of 4th Amendment – Removal
### [Am.C & Ae.C v. Newman, Mendoza, Inchausti, and Doe 1,]

233.    The minor PLAINTIFFS Am.C and Ae.C re-allege and incorporate paragraphs 1 through 217, inclusive, as though fully set forth at this point, as they relate to a claim for relief against NEWMAN, MENDOZA, INCHAUSTE, and DOE 1, for violations of Am.C and Ae.C's rights under the 4th Amendment to be free from unreasonable seizure, as such claim relates to their removal from their parents, care, custody, and control.

234.    PLAINTIFFS contend and allege that said removal was undertaken without consent, probable cause, a warrant, or exigent circumstances justifying the removal of the children, and without having performed a reasonable investigation or sought less intrusive means.

235.    PLAINTIFFS re-allege paragraphs 218 through 219 as said damages relate to a claim for relief for a violation of PLAINTIFFS' civil rights for the unlawful removal of the minor PLAINTIFFS from the care, custody, and control of their parents, the adult PLAINTIFFS herein.

236.    The punitive damage allegations of paragraph 220 apply in this claim for relief to NEWMAN, MENDOZA, INCHAUSTI, and DOE 1, for the violation of PLAINTIFFS' rights as stated.

## 5th CLAIM FOR RELIEF
Violation of 4th Amendment – Seizure
[Am.C & Ae.C v. Newman]

237.    The minor PLAINTIFFS Am.C and Ae.C re-allege and incorporate paragraphs 1 through 217, inclusive, as though fully set forth at this point, as they relate to a claim for relief against NEWMAN, for a violation of their rights under the 4th Amendment to be free from unreasonable seizure, as occurred when NEWMAN took the children from their parents and placed them in the patrol car driven to the scene by DOE 1 during the course of NEWMAN's "investigation" that evening.

238.    Minor PLAINTIFFS contend and allege that said seizure was undertaken without consent, probable cause, a warrant, or exigent circumstances justifying the separation of the children from their parents or either parent.

239.    Minor PLAINTIFFS re-allege paragraphs 218 through 219 as said damages relate to a claim for relief for a violation of minor PLAINTIFFS' civil rights for the unlawful seizure of the minor children as stated.

240.    The punitive damage allegations of paragraph 220 apply in this claim for relief to NEWMAN for the violation of minor PLAINTIFFS' rights as stated.

//

//

### 6th CLAIM FOR RELIEF
Violation of 14th Amendment – Interference Familial Relations
[Plaintiffs v. Newman, Mendoza, Inchausti, DOE 1]

241.    PLAINTIFFS re-allege and incorporate paragraphs 1 through 217,

inclusive, as though fully set forth at this point, as they relate to a claim for relief

against NEWMAN, MENDOZA, INCHAUSTI, and DOE 1 for a violation of

PLAINTIFFS' familial association rights under the 14th Amendment to the

United States Constitution, with regard to the warrantless removal of the minor

PLAINTIFFS from the PLAINTIFFS' residence.

242.    PLAINTIFFS re-allege the removal of their children was undertaken

without consent, probable cause, a protective custody warrant, or exigent

circumstances justifying removal, and without having performed a reasonable

investigation or sought less intrusive means.

243.    PLAINTIFFS re-allege paragraphs 218 through 219 as said damages

relate to a claim for relief for a violation of PLAINTIFFS' civil rights for the

warrantless removal of the minor PLAINTIFFS from the care, custody, and

control of their parents.

244.    The punitive damage allegations of paragraph 220 apply in this claim for

relief to NEWMAN, MENDOZA,INCHAUSTI, and DOE 1 for the violation of

PLAINTIFFS' rights as stated.

## 7th CLAIM FOR RELIEF
### Violation of 14th Amendment – Continued Detention

245.    PLAINTIFFS re-allege and incorporate paragraphs 1 through 217, inclusive, as though fully set forth at this point, as they relate to a separate and distinct claim for relief for a violation of PLAINTIFFS' rights under the 14th Amendment to the United States Constitution, against MENDOZA, INCHAUSTI, HOLQUIN, SOSA, PATEL, CAMPBELL, and DOE 2 – 10, for the continued detention of the children after removal and through the detention and jurisdictional hearings in violation of the parents and the children's 14th Amendment rights of familial association.

246.    This claim for continued detention is for the period from removal to the initial detention hearing, and extending beyond the detention hearing until the conclusion of trial in the juvenile dependency court, premised on the repeated use of false evidence, misrepresentations of fact and related testimony, and exclusion of exculpatory evidence presented to the juvenile dependency court, which PLAINTIFFS contend and allege was used as the means of accomplishing the continued detention of the children apart from their parents.

247.    PLAINTIFFS re-allege paragraphs 218 through 219 as said damages relate to a claim for relief for a violation of PLAINTIFFS' civil rights for the continued detention of the minor children.

248.    The punitive damage allegations of paragraph 220 apply in this claim for

relief to MENDOZA, INCHAUSTI, HOLQUIN, SOSA, PATEL, CAMPBELL, and DOE 2 – 10.

### 8th CLAIM FOR RELIEF
Violation of 14th Amendment – Presentation of False Evidence
[Plaintiffs v. Holguin, Patel, Sosa, Campbell, Fernandez, Does 2 - 10]

249.     PLAINTIFFS re-allege and incorporate paragraphs 1 through 217, inclusive, as though fully set forth at this point, as they relate to a separate and distinct claim for relief for a violation of PLAINTIFFS' rights under the 14th Amendment to the United States Constitution, against MENDOZA, INCHAUSTI, HOLQUIN, SOSA, PATEL, CAMPBELL, and DOES 2 – 10, based upon the presentation of false evidence, misrepresentations of fact and related testimony, and exclusion of exculpatory evidence in a child abuse proceeding.

250.     As to HOLGUIN, the claim is with regard to the initial W&IC 300 Petition she prepared and signed under oath, and the content thereof.

251.     As to PATEL and SOSA, it is for the same conduct in preparing the 1st Amended Petition, and the content thereof.

252.     As to CAMPBELL, it is for the false, misleading, and at times completely fabricated representations of fact included in the M.A.T. reports submitted to the court, and as to PATEL and CAMPBELL for their false testimony in the juvenile proceedings.

253.    This Claim for Relief is also against FERNANDEZ for the presentation of false facts under oath in the January 2012 Petition, and against ALVAREZ and SOSA for the January 2012 Detention Report.  This Claim for Relief is also against DOES 2 – 10 for his/her/their participation in any of the foregoing conduct engaged in during the child abuse proceeding.

254.    PLAINTIFFS re-allege paragraphs 218 through 219 as said damages relate to a claim for relief for a violation of PLAINTIFFS' civil rights as stated.

255.    The punitive damage allegations of paragraph 220 apply in this claim for relief to MENDOZA, INCHAUSTI, HOLQUIN, SOSA, PATEL, CAMPBELL, and DOES 2 – 10.

### 9th CLAIM FOR RELIEF
Violation of 14th Amendment – Unauthorized Medical Procedures
[Plaintiffs v. Sosa, Patel, Does 2 -10]

256.    PLAINTIFFS re-allege and incorporate paragraphs 1 through 217, inclusive, as though fully set forth at this point, as they relate to a claim for relief for a violation of PLAINTIFFS' familial association rights under the 14th Amendment to the United States Constitution, separate and distinct from the removal and/or continued detention of the minor PLAINTIFFS and consisting of the depriving of the PLAINTIFFS' due process rights notice and the opportunity to be heard as to the adult PLAINTIFFS, that they may decide whether or not their children are to receive medical care, and what medical care they are to

receive, which is also a 14th Amendment right of the minor PLAINTIFFS , and against SOSA, PATEL, and DOES 2 - 10.

257.    The PLAINTIFFS allege with regard to the minor children's inoculations that were to any extent ordered by a court, those inoculation orders were achieved by the presentation of false facts and information and the exclusion of exculpatory or mitigating facts and/or information.

258.    PLAINTIFFS re-allege paragraphs 218 through 219 as said damages relate to a claim for relief for a violation of PLAINTIFFS' rights as stated.

259.    The punitive damage allegations of paragraph 220 apply in this claim for relief to SOSA, PATEL, and DOES 2 - 10.

## 10th CLAIM FOR RELIEF
Violation of 1st & 4th Amendments - Unauthorized Medical Procedures / Battery
[Am.L & Ae.L v. Sosa, Patel, Does 2 - 10]

260.    The minor PLAINTIFFS re-allege and incorporate paragraphs 1 through 217, inclusive, as though fully set forth at this point, against SOSA, PATEL, and DOES 2 – 10, as they relate to a claim for relief for a violation of the minor PLAINTIFFS' familial association rights in the care, comfort, and presence of their parents during medical evaluations and/or procedures, pursuant to the 14th Amendment to the United States Constitution, and  with regard to the violation of their 1st and 4th Amendment rights of privacy in their bodies, and right to be

free from unreasonable search and seizure pursuant to the 1st and 4th Amendments to the U.S. Constitution.

261.    The minor PLAINTIFFS allege with regard to their inoculations that were to any extent ordered by a court, those inoculation orders were achieved by the presentation of false facts and information and the exclusion of exculpatory or mitigating facts and/or information.

262.    Minor PLAINTIFFS re-allege paragraphs 218 through 219 as said damages relate to a claim for relief for a violation of their civil rights as stated.

263.    The punitive damage allegations of paragraph 220 apply in this claim for relief to SOSA, PATEL, and DOES 2 - 10.

**11th CLAIM FOR RELIEF**
Intentional Infliction of Emotional Distress
[Plaintiffs v. Newman, Mendoza, Inchausti, Patel, Sosa, Campbell, Fernandez, Alvarez, and Does 1 - 10]

264.    PLAINTIFFS re-allege and incorporate paragraphs 1 through 217 inclusive, as though fully set forth at this point, as they relate to a claim for relief for intentional infliction of emotional distress for the actions and inactions of the defendants NEWMAN, MENDOZA, INCHAUSTI, DOE 1, PATEL, SOSA, and CAMPBELL, all actions / inactions undertaken prior to the June 21st, 2011 return of the children to their parents, and the actions and inactions of SOSA, ALVAREZ, FERNANDEZ, and DOES 2 -10 after June 21st, 2011, until the date

of dismissal of the juvenile proceedings on March 10th, 2012, as set forth in detail hereinabove.

265.    PLAINTIFFS allege the facts and circumstances set forth hereinabove set forth all necessary elements for a claim for relief against said defendants for intentional infliction of emotional distress, and that the actions of the named individual and DOE Defendants set forth hereinabove were intended to cause the PLAINTIFFS severe emotional distress, or were engaged in with reckless disregard for the likelihood of causing the PLAINTIFFS severe emotional distress, and did in fact cause PLAINTIFFS severe emotional distress.

266.    PLAINTIFFS re-allege paragraphs 218 through 219 as said damages relate to a claim for relief for intentional infliction of emotional distress.

267.    The punitive damage allegations of paragraph 136 apply in this claim for relief to NEWMAN, MENDOZA, INCHAUSTI, PATEL, SOSA, CAMPBELL, SOSA, ALVAREZ, FERNANDEZ, and DOES 1 – 10.

## 12th CLAIM FOR RELIEF
### Malicious Prosecution – January Petition & Proceedings
[Plaintiffs v. Fernandez, Alvarez, Sosa, Does 2 - 10]

268.    PLAINTIFFS re-allege and incorporate paragraphs 1 through 217, inclusive, as though fully set forth at this point, as they relate to a claim for malicious prosecution for the actions of defendants FERNANDEZ, ALVAREZ, SOSA, and DOES 2 - 10 in the filing and pursuit of the juvenile court dependency proceedings and involvement of DCFS in the lives of

PLAINTIFFS, as evidenced by the Petition, Detention Report, and Disposition Report which led to the hearing held March 10th, 2012.

269.     PLAINTIFFS allege that defendants ALVAREZ, FERNANDEZ, SOSA, and DOES 2 – 10 were actively involved in both bringing and continuing the proceeding, the proceeding ended in PLAINTIFFS' favor, and the proceeding was instituted primarily for a purpose other than succeeding on the merits of the claim, but rather for the a purpose of causing harm to PLAINTIFFS and retaliating due to PLAINTIFFS having filed documents indicating their intent to sue DCFS, and the defendant's conduct was a substantial factor in causing the harm to PLAINTIFFS.

270.     PLAINTIFFS re-allege paragraphs 218 through 219 as said damages relate to a claim for relief for malicious prosecution as stated.

271.     The punitive damage allegations of paragraph 136 apply in this claim for relief to ALVAREZ, FERNANDEZ, SOSA, and DOES 2 – 10.

### 13th CLAIM FOR RELIEF
*Monell* Liability – Entry, Search, Removal, Continued Detention, Medical Procedures
[Plaintiffs v. County]

272.     PLAINTIFFS re-allege, adopt, and incorporate as if set forth at length, and to the extent applicable, paragraphs 1 through 217.  PLAINTIFFS do not believe that a Claim for Relief based on a "*Monell*" theory of liability against COUNTY, need be separately stated as a Claim for Relief in a complaint, as it is

in the nature of a claim of "liability" as against an entity defendant. However, in an abundance of caution, a "*Monell*" claim is included hereby, based upon prior experience of PLAINTIFFS' counsel of a federal court judicial offers desire the "*Monell*" claim set forth separately as a claim for relief.

273.     At all relevant times herein, Defendant COUNTY, including through its DCFS and LASD, established and/or followed policies, procedures, customs, and/or practices (hereinafter collectively referred to as "policy" or "policies") which policies were the cause of violation of PLAINTIFFS' constitutional rights granted to them pursuant to 42 U.S.C. § 1983, as well as the case of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), including those under the First, Fourth, and Fourteenth Amendments, including but not limited to:

1.     The policies, practices, and procedures of COUNTY of detaining and/or removing children from their parents without exigent circumstances (imminent danger of serious bodily injury), court order and/or consent of their parents;

2.     The COUNTY policies, practices, and procedures of causing minor children to be dependents of the COUNTY, and as to COUNTY, fabricating and misrepresenting evidence, excluding and/or hiding exculpatory evidence from the court, all in an effort to cause the children to continue to be dependents of the court, removing the children's legal and physical custody from their parents

beyond a reasonable period after the basis for any such removal is negated, had it ever existed;

3.      The policies, practices and procedures of COUNTY of personnel (social workers) signing and presenting petitions in dependency actions under the penalty of perjury without personal knowledge of the truth and/or accuracy of the allegations contained therein and having not done any investigation of any kind as to the content of the allegations made;

4.      The policies, practices, and procedures of COUNTY of providing non-emergency medical care to minors without parental approval and/or court order and failing to notify parents and/or allow parents to attend medical appointments and procedures;

5.      The policies, practices and procedures of COUNTY refusing to provide exculpatory and/or relevant and related evidence, testimony, reports, and information regarding the investigation of juvenile dependency matters, even when properly requested and demanded; and

6.      By acting with deliberate indifference in implementing a policy, practice, or procedure of non-existent and/or inadequate training, and/or by failing to train their respective officers, agents and employees, in providing the Constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments, when performing actions related to the

investigation of child abuse and neglect, including dependency type proceedings. Defendant COUNTY, as well as DCFS and LASD as agencies or agents of the COUNTY, had duties to PLAINTIFFS at all times to establish, implement and follow policies, procedures, customs and/or practices which confirm and provide for the protections guaranteed PLAINTIFFS under the United States Constitution, including the First, Fourth, and Fourteenth Amendments; to use reasonable care to select, supervise, train, control and review the activities of all agents, officers, and employees in their employ, including within DCFS and/or LASD; and further, to refrain from acting with deliberate indifference to the Constitutional rights of PLAINTIFFS herein so as to not cause PLAINTIFF the injuries and damages alleged herein.

274.    Defendant COUNTY breached their duties and obligations to PLAINTIFFS, including, but not limited to, failing to establish, implement and follow the correct and proper Constitutional policies, procedures, customs, and practices, by failing to properly select, supervise, train, control, and review their respective agents and employees as to their compliance with Constitutional safeguards; and by permitting named Defendants, and other defendants whose identities are not yet known, to engage in the unlawful and unconstitutional conduct as herein alleged.

275.    Defendant COUNTY knew, or should have known, that by breaching the aforesaid duties and obligations that it was foreseeable that it would, and did, cause PLAINTIFFS to be injured and damaged by the wrongful policies and acts as alleged herein and that such breaches occurred in contravention of public policy and as to their respective legal duties and obligations to PLAINTIFFS.

276.    Defendant COUNTY also provided inadequate and/or non-existent training, including but not limited to, 1.) non-existent and/or inadequate training on the Fourth and Fourteenth Amendments as same apply in the context of a child abuse investigation that may involve the removal of children from their parent(s), 2.) the existence and/or use of protective custody warrants provided for under California law, 3.) the emotional trauma and psychological damage to a child from removal, 4.) the clearly established law of this federal circuit on the issues of warrantless removals, exigency, least intrusive means, and the proper investigation before removal of a child, 5.) state law applicable to juvenile dependency proceedings and the reunification of children with their parents, and/or avoidance of removal entirely.

277.    The aforementioned policies, practices, customs, and procedures, and lack of training and/or inadequate training stated above, and in paragraphs 17 and 18 herein, were the moving force and/or substantial factor in bringing about the constitutional deprivations complained of by PLAINTIFFS herein.

278.    PLAINTIFFS re-allege the allegations of paragraphs 218 through 219 as said damages relate to a claim of relief for a violation of their civil rights as stated and pursuant to the aforesaid policies, practices, customs, procedures, and/or non-existent / inadequate training.

279.    These actions, or inactions, of Defendants are the legal cause of injuries to PLAINTIFFS as alleged herein, and as a result thereto, PLAINTIFFS have sustained general and special damages, as well as incurring attorney fees, costs, and expenses, including those as authorized by 42 U.S.C. § 1983, to an extent and in an amount subject to proof at trial.

PRAYER FOR RELIEF,

WHEREFORE, PLAINTIFFS respectfully requests that this Court:

1.)    Award PLAINTIFFS general, special and compensatory damages in an amount to be proven at trial;

2.)    Award PLAINTIFFS punitive damages against individually named Defendants, and each of them, for their extreme and outrageous conduct in complete disregard for the rights of the PLAINTIFFS;

3.) Award PLAINTIFFS statutory damages and/or attorney's fees against all Defendants as allowed by 42 U.S.C. §1988 and C.C.P. §1021.5;

4.) Grant PLAINTIFFS such other and further relief as the Court may deem just and proper.

1

Dated:  8/21/12                                    ___/S/ Robert R. Powell_

2                                                              Robert R. Powell, Esq.

3                                                              Attorney for Plaintiffs

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2nd Amended Complaint
Xoss v. County of Los Angeles
U.S.D.C. Central Dist. Case #CV 12-01400 PSG (RZx)